UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KLOECKNER METALS CORPORATION                                          PLAINTIFF

v.                              No. 2:22-cv-02025

FIVE RIVERS DISTRIBUTION, LLC                                        DEFENDANT

**OPINION AND ORDER**

Before the Court are Plaintiff Kloeckner Metals Corporation's ("Kloeckner") motion (Doc. 19) for partial summary judgment, brief (Doc. 20) in support, and statement of facts (Doc. 21). Defendant Five Rivers Distribution, LLC ("Five Rivers") has filed a response (Doc. 24), response to statement of facts (Doc. 25), and brief (Doc. 26) in opposition, to which Kloeckner has filed a reply (Doc. 27).[1]  For the reasons set forth below, the motion will be GRANTED.

**I.   Background**

Kloeckner is a Delaware corporation with its principal place of business in Georgia. (Doc. 2, p. 1).  Five Rivers is an Arkansas limited liability company which is organized, domiciled, and headquartered in Arkansas.  *Id.*  On January 19, 2019, Kloeckner entered into a bailment agreement (Doc. 2-1) with Five Rivers for the processing, storage, and delivery of various Kloeckner metal products. (Doc. 2, p. 2).  As relevant here, the bailment agreement provided:

> 6.      Insurance and Risk of Loss. Processor [Five Rivers] agrees to keep all of the Company [Kloeckner] Inventory insured against theft, destruction and other perils customarily covered by inventory insurance with insurance companies and at levels of coverage satisfactory to Company, and to bear all risk of loss with respect to the loss of or damage to the Company Inventory while in Processors [sic] possession. The Company shall be named as a loss payee and additional insured by endorsement on all such insurance policies maintained by Processor.  No such

---

[1]     The Court notes that Kloeckner's reply brief is 14 pages long as opposed to the seven pages authorized in the Court's final scheduling order (Doc. 18, p. 3).  As a result, the Court did not consider pages 8–14 of Kloeckner's reply brief.  Counsel for Kloeckner is admonished to follow the Court's orders.

1

>policy shall be terminated (for whatever reason), expire or be materially modified without at least 30 days prior written notice to Company (the "30 Day Notice"). Immediately following execution of this Agreement by Processor and on an annual basis thereafter, it shall furnish an up to date certificate(s) of insurance to Company specifically evidencing that the Processor has inventory insurance in place as required by this Section 6 and is otherwise in compliance with its obligations under this Section 6. Without limiting the above, the certificate(s) shall be specifically endorsed to state that: (i) the insurance covers special causes of loss (including theft) of personal property of others at its replacement cost; (ii) the Company is named as a loss payee and additional insured; and (iii) the 30 Day Notice applies.

(Doc. 2-1, ¶ 6). The agreement further provided that it would "be governed, with respect to any Company Inventory, by the law of the State of Georgia." *Id.* at ¶ 9. Five Rivers' president, Marty Shell, signed the agreement. *Id*. p. 4.

As Five Rivers received Kloeckner's inventory, it mailed invoices to Kloeckner for the labor cost of moving it into storage. (Doc. 26, p. 5). The invoices were titled "Non-Negotiable Warehouse Receipt and Invoice." (Doc. 24-1). Text at the bottom of the warehouse receipts read as follows: "The goods are stored subject to all the terms and conditions stated on the reverse hereof. Said terms and conditions constitute a contract to which [the] customer agrees by the acceptance of this Warehouse Receipt." *Id.* These conditions stated that Five Rivers would only be liable for harm to the inventory caused by its own negligence and that its liability would be limited to the least of four figures (including 50 cents per pound of goods and 50 times the monthly storage fee). Although Kloeckner could request an increase in Five Rivers' liability in writing, this would subject Kloeckner to "an increased charge." *Id.* (emphasis omitted). The warehouse receipts also contained the following merger clause:

>SECTION 16–ENTIRE AGREEMENT
>This agreement shall constitute the entire agreement between COMPANY and STORER relating to the GOODS and supersedes all existing agreements between them whether written or oral and shall not be changed, amended or modified except by written agreement signed by representatives of COMPANY and STORER.

*Id.* Kloeckner did not request an increase in Five Rivers' liability at any time after receiving the

2

warehouse receipts. (Doc. 26, p. 7).

In late May and early June of 2019, the Arkansas River flooded. (Doc. 26, p. 8). Five Rivers had stored Kloeckner's inventory in a warehouse on the Poteau River, a tributary of the Arkansas River. (Doc. 24-2, ¶ 2). In preparation for the flood, Five Rivers' employees made extensive efforts to protect Kloeckner's inventory, including moving it to a warehouse higher off the water, placing sandbags around the warehouses, placing sandbags and thick sheets of plastic in the warehouse doorways, and placing floodgates in the warehouse entrances. *Id.* at ¶¶ 14–15. Despite these efforts, the flood destroyed all three warehouses on the site and damaged the inventory inside. *Id.* at ¶¶ 17–18. Kloeckner estimates that it lost roughly $1 million worth of inventory due to the flood damage. (Doc. 2, pp. 3–4).

After the flood, Kloeckner sought reimbursement for the damaged inventory under the bailment agreement. (Doc. 2, p. 4–5). Five Rivers declined, citing the limitation of liability on the warehouse receipts. (Doc. 25, pp. 3–4). Kloeckner then filed the present suit, alleging breach of contract, negligence, and bailment. (Doc. 2, pp. 4–8). The present motion for summary judgment only concerns the contract claims. (Doc. 19, p. 1). Kloeckner does not seek a determination of damages on summary judgment. (Doc. 20, p. 2).

**II.   Legal Standard**

A party is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because this is a diversity action, state substantive law governs the validity and interpretation of the contracts at issue, including whether they are ambiguous. *Best Buy Stores, L.P. v. Benderson-Wainberg Assocs., L.P.*, 668 F.3d 1019, 1026 (8th Cir. 2012). Under both Arkansas and Georgia law, interpretation of an unambiguous contract is a matter of law. *Rowland*

*v. Faulkenbury*, 883 S.W.2d 848, 850 (Ark. Ct. App. 1994); *Am. Water Serv. USA v. McRae*, 650 S.E.2d 304, 306 (Ga. Ct. App. 2007).  Conversely, if the contract is ambiguous, its meaning is a question of fact not suitable for summary judgment.  *Carvall v. Allstate Ins. Co.*, 76 S.W.3d 901, 904 (Ark. Ct. App. 2002); *Atlanta Dev., Inc. v. Emerald Cap. Inv., LLC*, 574 S.E.2d 585, 589 (Ga. Ct. App. 2002).

### III. Choice of Law

The parties agree that Georgia law applies to the interpretation of the Bailment Agreement (Doc. 20, pp. 5–6; Doc. 26, p. 12).  Five Rivers further asserts that the warehouse receipts, the rights and obligations of the parties, and the effect of the warehouse receipts on the bailment agreement are all governed by Arkansas law. (Doc. 26, p. 12).  The Court agrees with Five Rivers.

Federal courts follow their forum states' choice-of-law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  This Court, therefore, applies Arkansas choice-of-law rules.  In contract cases, Arkansas applies the law of the state with the most significant relationship to the case.  *Ducharme v. Ducharme*, 872 S.W.2d 392 (Ark. 1994).  If there is no effective choice of law by the parties, the following factors determine which state has the most significant relationship: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; [and] (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (AM. L. INST. 1971)).

Because the warehouse receipts are not classical negotiated contracts, it cannot really be said that there is a place of contracting or a place of negotiation.  However, the place of performance was clearly Arkansas: the goods themselves and the warehouses used to store them were located in Arkansas; and one of the parties (Five Rivers) is an Arkansas limited liability

4

company which is organized, domiciled, and has its principal business in Arkansas. Therefore, despite Kloeckner being a Delaware corporation headquartered in Georgia, Arkansas has the most significant relationship to the warehouse receipts. The Court accordingly interprets them under Arkansas law.

## IV. Analysis

### a. Warehouse Receipts

Five Rivers argues that the terms on the back of the warehouse receipts supersede the bailment agreement. The Court disagrees.

The two documents at issue here both purport to invalidate each other. The bailment agreement provides that neither the "Agreement, nor any term [t]hereof may be charged, discharged, modified, amended, waived or consensually terminated, except only by an instrument in writing signed by a representative of each of the parties duly authorized for that purpose." (Doc. 2-1, p. 4). However, the warehouse receipts, which purport to modify, amend, or waive many parts of the bailment agreement, were only signed by Five Rivers' representative. (Doc. 24-1). The warehouse receipts, for their part, purport to "constitute the entire agreement between COMPANY and STORER relating to the GOODS and supersede[ ] all existing agreements between them whether written or oral." *Id.* Because the two documents cannot be interpreted in harmony with one another, the Court must decide which one to enforce.

Under Arkansas law, "[a] warehouse receipt need not be in any particular form." ARK. CODE ANN. § 4-7-202(a) (2020). A warehouse receipt need only be signed by "the warehouse or its agent," not the other party. § 4-7-202(b)(7). "Unless otherwise agreed, the warehouse is not liable for damages that could not have been avoided by the exercise of [due] care" if there is a warehouse receipt in place. § 4-7-204(a) (emphasis added). Further, "[d]amages may be limited

by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage." *Id.* at 4-7-204(b). Here, the warehouse receipt is signed by an agent of Five Rivers, and Kloeckner does not claim any defect in its form. Therefore, in the absence of the bailment agreement, the warehouse receipt would fix the terms of storage even though only Five Rivers signed it. Five Rivers, for its part, does not claim any defect in the form of the bailment agreement. It was signed by representatives of both parties and reflects mutual consideration. Therefore, the Court treats the bailment agreement as a valid contract which would bind both parties in the absence of the warehouse receipts.

Because either instrument would be valid and binding in the other's absence, the Court must determine what legal effect they have on one another. The bailment agreement was signed on January 19, 2019, and the first warehouse receipt (for unloading the delivered goods) is dated March 13, 2019. (Doc. 24-1). Arkansas law is silent as to the effect of an after-issued warehouse receipt on an existing bailment agreement. When there is no state law on point, a federal court must predict how the state supreme court would rule on the issue. *N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 892 (8th Cir. 2020). Based on the common law, the text of the relevant statute, and background principles of Arkansas law, the Court predicts that the Arkansas Supreme Court would give effect to the bailment agreement.

First, courts in many other jurisdictions have held that a warehouse receipt issued after delivery of the goods has no effect on a preexisting bailment agreement. *J.W.S. Delavu, Inc. v. E. Am. Transp. & Warehousing.*, 810 A.2d 672, 682 (Pa. Super. Ct. 2002) ("It would demean the importance of the written agreement if the parties could find themselves bound by pre-printed terms and conditions on a warehouse receipt, especially after they had engaged in extensive negotiations and mutually agreed to terms, which did not include those contained in the warehouse

receipt."); *De Cecchis v. Evers*, 174 A.2d 463, 464 (Del. Super. Ct. 1961) ("The cases appear to be practically unanimous in holding that . . . in the absence of proof that the proposed change was expressly called to bailor's attention, the mere receipt and retention of a requested modification, with nothing more, is not enough to show consent.") (collecting cases); *Grain Dealers Nat. Fire Ins. Co. v. Union Co.*, 111 N.E.2d 256, 261 (Ohio 1953) ("The general rule seems to be that where at the commencement of the bailment no mention of the stipulation limiting the liability of the warehouseman is made, the contract cannot subsequently be changed by provisions in the warehouse receipt without the consent of the bailor."); *Abend v. Haberman*, 119 N.Y.S.2d 488, 490 (N.Y. App. Div. 1953) ("[T]his storage receipt was mailed to plaintiff a few days after the agreement of bailment had been entered . . . and at a time subsequent to the delivery of the garments. The unilateral issuance of this storage receipt . . . in the absence of consent by plaintiff, did not superimpose its terms upon the previous contract."). Here, Five Rivers admits that the warehouse receipts were mailed "*[a]fter* Five Rivers took possession of Kloeckner's steel product." (Doc. 25, p. 2) (emphasis added). Therefore, under the majority rule, the warehouse receipts do not alter the terms of the bailment agreement.

Second, the text of the relevant Arkansas law supports enforcement of the bailment agreement. Title 4, chapter 7, section 204(b) of the Arkansas Uniform Commercial Code states that "[d]amages may be limited by a term in a warehouse receipt *or storage agreement*" (emphasis added). This indicates that storage agreements such as the bailment agreement here are on equal footing with warehouse receipts in terms of setting the warehouse's liability. In other words, where the warehouse receipt and storage agreement set different limitations on liability, there is no indication that the warehouse receipt controls simply by virtue of its being a warehouse receipt. Indeed, one commentary on the Uniform Commercial Code suggests that the opposite is true: "A

limitation of liability clause contained in a warehouse receipt which was not mailed by the bailee until after it had received the goods for storage is not effective to alter the terms of the bailment as originally made." LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, § 7-204:24 (3d ed. 2021). This indicates that the Uniform Commercial Code is compatible with the majority rule.

Finally, background principles of Arkansas law support enforcement of the bailment agreement. Arkansas law requires that both parties agree to any modification of a contract, manifesting assent to both the modification itself and the modification's particular terms. *Van Camp v. Van Camp*, 969 S.W.2d 184, 186 (Ark. 1998) (citing *Leonard v. Downing*, 438 S.W.2d 327, 328 (Ark. 1969)). Kloeckner has made no such manifestation. Therefore, enforcement of the warehouse receipts would be disfavored under Arkansas contract principles.

For these reasons, this Court predicts that the Arkansas Supreme Court would conclude that the warehouse receipts have no legal effect on the terms of the bailment agreement. Accordingly, the Court will enforce the bailment agreement.

b. <u>Acts of God</u>

In the alternative, Five Rivers argues that the flood constitutes an act of God which excuses its performance of the bailment agreement under Georgia law. (Doc. 26, p. 21). It notes that the waters breached its warehouse, which was built to withstand the previous record crest level. *Id.* While all this may be true, it is irrelevant. Georgia Code § 13-4-21 makes clear that the "Act of God" doctrine applies only when "performance of the terms of a contract becomes impossible as a result of an act of God." But the terms at issue here, that Five Rivers must insure the inventory and bear all risk of loss, were not rendered impossible by the flood. The insurance should have been acquired well beforehand, and Five Rivers could have compensated Kloeckner for its losses at any point after the flood. Therefore, the Act of God doctrine does not apply to this case.

      c. <u>Flood Damage</u>

Finally, Five Rivers claims that the bailment agreement's risk of loss provision is ambiguous. (Doc. 26, p. 22). It asserts that its duty to keep the inventory "insured against theft, destruction and other perils customarily covered by inventory insurance … and to bear all risk of loss with respect to the loss of or damage to the" inventory (Doc. 2-1, ¶ 6) is ambiguous. (Doc. 26, p. 22). While this is a closer question, the Court finds that the language is not ambiguous.

Ambiguous contract terms cannot be resolved on summary judgment. *Swift & Co.,* 539 F.3d at 851. A contract is ambiguous under Georgia law when "an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties." *ADI Fin. Servs., Inc. v. City of Atlanta*, 714 S.E.2d 270, 272–73 (Ga. Ct. App. 2011). "Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." GA. CODE ANN. § 13-2-2.2 (2010).

Kloeckner claims that Five Rivers breached two contractual obligations: to insure the inventory against flood damage and to bear all risk of harm to the inventory. As to Kloeckner's first theory of breach, the parties agree that "inventory insurance" is not a term of art and instead refers to property insurance covering inventory. (Doc. 20, p. 8; Doc. 26, p. 24). Most standard property insurance in Georgia excludes loss due to flooding. J. STEPHEN BERRY, GEORGIA PROPERTY AND LIABILITY INSURANCE LAW § 3:40 (2022). Kloeckner argues that because the bailment contract mentions theft, which is not typically covered by standard insurance policies, the contract implicitly requires the acquisition of a policy covering "special causes of loss," which would also include flood damage. (Doc. 20, p. 8 (citing William H. Locke, Jr., INSURANCE 101, 48-SPG Tex. J. Bus. L. 1, 13)). Support for Kloeckner's reading is found later in the insurance

provision, where Five Rivers agrees to produce insurance certificates "specifically endorsed to state that … the insurance covers special causes of loss (including theft) of personal property of others at its replacement cost." (Doc. 2-1, ¶ 6).

While Kloeckner appears correct as to the kind of insurance required by the bailment contract, it is less clear whether the contemplated coverage would have included flood protection. Insurance covering special causes of loss is also known as "all risk" coverage. *Special Causes of Loss Form*, INSURANCE RISK MANAGEMENT INSTITUTE, https://www.irmi.com/term/insurance-definitions/special-causes-of-loss-form. Such insurance covers losses from all causes except those specifically excluded in the policy. *Id.* Therefore, it is possible to have "special causes of loss" or "all risks" insurance which specifically excludes flood damage. Accordingly, the contract is ambiguous as to whether Five Rivers was required to insure Kloeckner's inventory against flood damage, and Kloeckner is not entitled to summary judgment on its first theory of breach.

Kloeckner's second theory is that Five Rivers breached its duty "to bear all risk of loss with respect to the loss of or damage to the [Kloeckner] Inventory while in [Five Rivers'] possession." (Doc. 2-1, ¶ 6; Doc. 20, p. 9). Five Rivers argues that the scope of this provision should be interpreted in light of the surrounding provisions, which concern insurance. (Doc. 26, p. 26).[2] It claims that its liability for loss is coextensive with the amount of insurance it is required to provide. *Id.* However, in context, the phrase "bear all risk of loss" is not coextensive with the causes of loss which Five Rivers is required to insure against.

Under Georgia law, "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction

---

[2]   Five Rivers further argues that "all risks of loss" should only apply to those losses customarily covered by inventory insurance. (Doc. 26, p. 26). However, as the provision makes clear when read as a whole, the bailment contract contemplates coverage for special causes of loss.

of any part." GA. CODE ANN. § 13-2-2.4. While Five Rivers agreed to insure Kloeckner's inventory "against theft, destruction and other perils customarily covered by inventory insurance," it assumed "all risk of loss with respect to the loss of or damage to [Kloeckner's] Inventory while in [Five Rivers'] possession." (Doc. 2-1, ¶ 6). In other words, the scope of events against which Five Rivers must insure ("theft, destruction, and other perils customarily covered by property insurance") is narrower than the scope of events for which it assumes the risk of loss ("loss of or damage to" Kloeckner's goods). Five Rivers' reading asks us to ignore this difference. Further, a requirement to "bear all risk of loss" only to the extent that the loss is already insured is essentially meaningless. Therefore, only Kloeckner's reading "uphold[s the] contract in whole and in every part" in accordance with Georgia's rules of construction.[3] GA. CODE ANN. § 13-2-2.4. Because Georgia's rules of construction support Kloeckner's reading, the language is unambiguous under Georgia law. *ADI Fin. Servs.*, 714 S.E.2d at 272–73.

"Contract provisions enlarging or diminishing a bailee's common law or statutory liability will be given effect; if the contract language is unambiguous, it is given its literal meaning." *Dominguez v. Enterprise Leasing Co.*, 399 S.E.2d 269, 271 (Ga. Ct. App. 1990) (quoting *Saf–T–Green of Atlanta v. Lazenby Sprinkler Co.*, 312 S.E.2d 163, 164 (Ga. Ct. App. 1983)). Because the language is unambiguous under Georgia law, the Court interprets it according to its literal meaning. Accordingly, at the time of the flood, Five Rivers bore "all risk of loss" for any "loss or damage" to Kloeckner's inventory.

Because the bailment agreement was unaffected by the warehouse receipts, Five Rivers' performance was not excused under the Act of God doctrine, and Five Rivers unambiguously

---

[3] It is true that, as noted above, special causes of loss insurance is also called "all-risks" insurance. But if "bear all risks" were read only to mean "carry special causes of loss insurance," the "bear all risks" requirement would be redundant.

11

agreed to bear all risk of loss for any loss or damage to Kloeckner's inventory, Five Rivers is in breach of the bailment contract for not reimbursing Kloeckner's flood-related inventory losses. Therefore, summary judgment for Kloeckner is appropriate on Count 1.

**V.   Conclusion**

IT IS THERFORE ORDERED that Plaintiff's motion (Doc. 19) for partial summary judgment is GRANTED as to Count 1 of the complaint.  The question of Plaintiff's damages remains for trial.

IT IS SO ORDERED this 12th day of October, 2022.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
U.S. DISTRICT JUDGE